## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| THE PEOPLE OF GUAM<br><br>vs.<br><br>JORDAN MICHAEL BABAUTA (DOB: 03/15/1991),<br>BRANDON RUFUS CHANDLER aka BRANDO RUFUS CHANDLER (DOB: 02/14/1989),<br>JASON KEITH MANIBUSAN (DOB: 08/20/1977), and<br>CYNTHIA ROSE QUINATA (DOB: 10/18/1976),<br><br>Defendants. | CRIMINAL CASE NO. CF0458-23<br><br>**DECISION AND ORDER**<br>*Re: Defendant's Motion to Suppress* |

This matter came before the Honorable Arthur R. Barcinas on June 14, 2024, on a hearing for Defendant Jordan Michael Babauta's ("Defendant") Motion to Suppress ("Motion"). Defendant was represented by Attorney Vanessa Williams; Co-Defendant Cynthia Rose Quinata was present, represented by Attorney Minakshi Hemlani; and Co-Defendant Brandon Rufus Chandler was present, represented by Attorney William Gavras. Co-Defendant Jason Keith Manibusan was also present, but his counsel, Attorney David Lujan, was not. Assistant Attorney General ("AAG") Sean Brown was present for the People.

### BACKGROUND

On April 17, 2024, Defendant filed the instant Motion, moving the Court, pursuant to 8 GCA § 65.25 and Guam R. Crim. P. ("GRCRP") Rule 1.1(b)(1) and (2), to suppress all

evidence seized following the allegedly unlawful traffic stop on February 1, 2023, and subsequent vehicle search and seizure, all of which Defendant argues were in violation of his Fourth Amendment rights. Defendant asserted that the stop was not based on any observed traffic violation, that he was merely a passenger in the vehicle, and that he was immediately detained when discovered in the vehicle.

On April 23, 2024, the People filed their Response to the Motion, arguing that investigative questioning does not, in itself, implicate the Fourth Amendment and that brief detentions are permitted under the Fourt Amendment when a police officer has reasonable suspicion that an individual was engaged in illegal conduct.

At the hearing on June 14, 2024, GPD Officer Austin R. Cruz testified that, on February 1, 2023, officers in the Agat Precinct of the Guam Police Department ("GPD") were notified to establish a perimeter around the inner streets of Agat. 2:33:28, Hearing Tr. (June 14, 2024). This notification was based upon information from GPD detectives that Defendant, then a person of interest with a warrant of arrest, had been seen fleeing toward the area in a red Toyota Camry. *Id.* Officer Cruz testified that he had been provided that information from his supervisor, and subsequently dispatched to secure the perimeter entrances to the inner streets of Agat and conduct pullovers of vehicles exiting the area. *Id.,* at 2:26:14, 2:34:24. Officer Cruz testified that, by the time of the stop in question, he had personally pulled over a total of two vehicles, the second of which was the silver Lexus containing Defendant. *Id.,* at 2:28:27, 2:35:40. Officer Cruz testified that a call went out to pull over a white Lexus, and that the Lexus he pulled over looked white at first in the dark, but was later discovered to be silver. *Id.,* at 2:37:21.

Officer Cruz testified that he was alone in his vehicle when he conducted the stop, and that he asked the driver to roll down the windows because he and the officers securing the perimeter had been told that Defendant might have a weapon. *Id.*, at 2:29:16. Officer Cruz testified that, at the time, he was not aware if Defendant had outstanding warrants. *Id.*, at 2:31:36. Officer Cruz further testified that, upon discovering Defendant in the back seat of the car, he and an Officer J.S. Cruz instructed Defendant to exit the vehicle and detained Defendant in handcuffs until detectives arrived, at which point they released Defendant into the detectives' custody. *Id.,* at 2:39:44.

At the same hearing, GPD Det. Andrew J.P. Pangelinan testified that he and other detectives were "assisting the CAPS unit for the apprehension of Jordan Babauta, and that Defendant's warrant of arrest had been announced at a briefing earlier that day. *Id.*, at 2:42:03. Det. Pangelinan testified that he and a Det. Santo Tomas were in Agat searching for Defendant for "a couple of hours" before receiving word of any activity. *Id.* at 2:43:53. Det. Pangelinan further testified that he was called to assist after Defendant was found and detained by another officer. *Id.* at 2:44:36. Det. Pangelinan testified that he observed numerous police officers when he arrived, adding that the entire division was participating in the manhunt for Defendant. *Id.* at 2:51:55.

Det. Pangelinan testified that, upon arrival, he spoke with the owner and operator of the car, and that she consented to the search of her vehicle. *Id.* at 2:44:54. Upon being presented with Ex. 1, Det. Pangelinan identified it as a GPD Consent to Confiscate form, which he completed with the owner of the vehicle after she consented to search. *Id.* at 2:46:51. Det. Pangelinan testified that, after the owner consented to the search, the detectives searched the vehicle and filled out the form to confiscate the items. *Id.,* at 2:47:41. Det. Pangelinan testified that the initial search

was performed in Agat, but that the vehicle was then impounded and towed via GPD wrecker to the GPD crime lab in Mangilao. *Id.* Det. Pangelinan testified it was necessary to impound the car because the area was not a controlled area. *Id.*, at 2:56:45. Det. Pangelinan testified that the search yielded a checkbook belonging to the victim. *Id.*, at 2:48:41. Det. Pangelinan confirmed that the signatures on the form belonged to himself, the owner of the vehicle, and an Officer Gregory Garcia, who located the checkbook. *Id.*, at 2:50:50. On cross-examination, Det. Pangelinan reaffirmed that he met with the owner, received her consent, and then took her to the Agat Precinct, but did not recall all information from the interview. *Id.*, at 2:52:28. Det. Pangelinan testified that Defendant had a backpack on him, but that he did not tell Officer Garcia to check the backpack. *Id.*, at 2:55:59, 2:57:15.

At the end of the June 14, 2024 hearing, the Court ordered Defendant to file a supplemental brief regarding the search of Defendant's backpack, and the "hot pursuit" assertion raised by the People at the hearing. The Court subsequently took the matter under advisement. On June 19, 2024, Defendant filed the Supplemental Brief. On June 21, 2024, the People filed their Response to the Supplemental Brief.

## DISCUSSION

In the Motion, Defendant moved the Court to suppress all evidence from the February 1, 2023 stop, arguing that: (1) the initial stop of the vehicle was not a valid traffic stop under the Fourth Amendment and therefore constituted an unlawful seizure; (2) the impounding of the vehicle was outside the scope of the purported traffic stop and thus constituted an unlawful seizure; (3) the consent obtained to search the vehicle was invalid because it was obtained during an allegedly unlawful encounter; (4) the consent to search the vehicle was involuntary under the totality of the circumstances; and (5) under the exclusionary rule and the fruit of the

poisonous tree doctrine, the items found in the vehicle are inadmissible products of an unlawful search and seizure. Mot., at 4-10. The Court will address each argument below.

**I. Whether the initial stop of the vehicle was a valid traffic stop under the Fourth Amendment**

Defendant argues that Officer Cruz's pullover of the vehicle constituted an unreasonable search and seizure in violation of Defendant's Fourth Amendment rights. Defendant argues that such a stop is generally only "reasonable when the police have probable cause to believe that a traffic violation has occurred" or "reasonable suspicion to believe the driver has committed a traffic violation." Mot., at 5 (quoting *People v. Chargualaf*, 2001 Guam 5 ¶ 17). Defendant states that the reporting officers' reports both specifically state they were conducting a "traffic stop," but do not indicant any reasonable suspicion to believe the driver had committed a traffic violation. "The facts known to the officers at the time they conducted the stop were simply that CID detectives instructed them to stop a white Lexus." *Id.* Defendant further argues Officer Cruz "did not even identify that there were three occupants in the vehicle, nor recognize Babauta until *after* the stop had already occurred." *Id.* (emphasis original). Therefore, Defendant argues, "looking at the totality of the circumstances, including facts known to the officers from personal observation at the time the stop was initiated, the officers did not have reasonable suspicion that a traffic violation had occurred. The stop was thus unlawful under the Fourth Amendment." *Id.*

The People argue that investigative questioning regarding criminal activity does not, in itself, implicate the Fourth Amendment, and that brief detentions are permitted under the Fourth Amendment when a police officer has reasonable suspicion that an individual was engaged in illegal conduct." Opp., at 1 (citing *Chargualaf*, 2001 Guam 5 ¶ 20; *People v. Johnson*, 1997 Guam 9 ¶ 4). The People state that while searches and seizures without a proper warrant are

generally presumptively unreasonable, that presumption is subject to several exceptions, including consent to search. *Id.* (citing *People v. Cundiff*, 2006 Guam 12 ¶ 42). "The principal components of a determination of reasonable suspicion ... will be the events which occurred leading up to the stop ..., and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion ... ." Opp., at 2 (quoting *Ornelas v. US*, 517 US 690, 696 (1995)). The People argue that reasonable suspicion entails some minimal level of objective justification for making a stop, but considerably less than the level of suspicion required for probable cause. *Id.* (citing *US v. Sokolow*, 490 US 1, 7 (1989)). The People further argue that the determination of reasonable suspicion "is dependent upon both the content of information possessed by police and its degree of reliability." *Id.* (quoting *Johnson*, 1997 Guam 9 ¶ 5). The People assert that, even if there was no traffic violation to support an ordinary traffic stop, "homicide and eluding police are criminal offenses that warrant possible detainment or arrest." *Id.*, at 3. GPD officers had set up a perimeter of the inner streets of Agat on information that Defendant had entered the area, and were detaining all vehicles exiting the perimeter for suspicion that Defendant may be attempting to escape.

In his Supplemental Brief, Defendant stated that exigent circumstances, "namely, hot pursuit of a fleeing felon and the risk that Babauta might flee again," did not justify the stop because the key elements of the "hot pursuit" doctrine include the necessity for an immediate or continuous chase stemming directly from the crime scene. Supp. Br., at 2. Defendant argues that a chase is no longer continuous so as to qualify as a "hot pursuit" when there is a significant break or delay in the pursuit that results in the loss of immediate or continuous tracking of the suspect. Defendant acknowledges that police reports indicate that GPD officers gave chase to

Defendant at approximately 7:05 PM, but notes that the officers lost sight of the vehicle around the Agat, Santa Cruz area and continued to travel south towards the Umatac Mayors Office without finding Defendant. *Id.*, at 5 (citing Suppression Hearing, Ex. D at 23-002207 (Officer G. Garcia Report). "The officers were not then chasing Babauta in any literal sense." *Id.* Defendant states that police reports further indicate that detectives did not order the perimeter set around the inner streets of Agat until 8:20, where they had received information he may "possibly" have been located. *Id.* (citing Suppression Hearing, Ex. A, at 23-02207, p.29 (Officer Cruz Report); Ex. B, at 23-02207, p.51 (Officer Manglona Report). Defendant asserts that none of the officers' reports indicate how the information about Babauta's possible location was obtained, and there was no evidence that the officers immediately and continuously tracked Defendant from the red Toyota Camry to the Lexus he was found in.

The Fourth Amendment protects against unreasonable searches and seizures and is made applicable to Guam via section 1421b(c) of the Organic Act of Guam. *Chargualaf,* 2001 Guam 1 ¶ 14. A seizure occurs under the Fourth Amendment whenever a motorist is stopped by an agent of the government. *People v. Calhoun,* 2014 Guam 26 ¶ 12. "The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular government invasion of a citizen's personal security.'" *Chargualaf,* 2001 Guam 1 ¶ 14. "Reasonableness 'depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers. *Calhoun,* 2014 Guam 26 ¶ 12. "Consideration of the constitutionality of such seizures advances the public interest, and the severity of the interference with individual liberty." *Id.* ¶ 13 (citing *Brown v. Texas,* 443 US 47, 51). When evaluating the reasonableness of a seizure, the U.S. Supreme Court provides a three-prong balancing test: (1) the gravity of the concerns served by the seizure; (2) the degree

to which the seizure advances the public interest; and (3) the severity of the interference with individual liberty. *Id.* In applying this test, the Supreme Court has held, for example, that in the context of checkpoints, the initial stop of every motorist passing through a drunk driving checkpoint and the associated preliminary questioning and observation by officers is reasonable under the Fourth Amendment. *See Mich. Dept. Of State Police v. Sitz*, 496 U.S. 444 (1990).

Upon consideration of the record and the parties' arguments, the Court finds that the stop was justified. Defendant's argument is predicated on the assumption that a traffic stop may only be properly conducted pursuant to a traffic violation. However, a traffic violation is not the only lawful basis for an officer to conduct a vehicle stop; "[a]n officer may stop a vehicle with reasonable suspicion that a person inside has committed, is committing, or is about to commit a crime." *US v. Nault*, 41 F.4th 1073, 1079 (9th Cir. 2022). "That can include suspicion that [the person in question] is the subject of an outstanding warrant." *Id.*[1] Detective Pangelinan testified at the hearing that Defendant had at least one warrant of arrest, a fact which had been announced at a briefing earlier that day. Therefore, when GPD detectives were directing the officers maintaining the perimeter to stop all vehicles exiting the perimeter, those directions were based on a reasonable suspicion that Defendant, who was a person of interest in a homicide case and the subject of an arrest warrant, would be attempting to escape the perimeter in one of those vehicles. By extension, all stops conducted in furtherance of those directions would be based on that same reasonable suspicion. *See U.S. v. Robinson*, 536 F.2d 1298, 1299-

---

[1] Defendant notes that the officers referred to this as a "traffic stop," but this does not affect the Court's analysis. The US Supreme Court and the Ninth Circuit have both used "traffic stop" to refer to investigative stops of drivers in their vehicles for reasons other than observed traffic violations. *See Brendlin v. California*, 551 US 249, 256 (2007) (citing as an example of a "traffic stop" *State v. Henley*, 469 US 221 (1985), which involved a stop of a vehicle in connection with a "wanted flyer"); *see also US v. Hylton*, 30 F.4th 842, 845 (9th Cir. 2022) (describing as a "traffic stop" an encounter that began when police approached a vehicle already stopped in the middle of a busy intersection). "Whether described as a 'traffic stop' or an 'investigative vehicle stop,' the analysis here is the same." *Nault*, 41 F.4th, at 1080. For the purposes of this matter, a 'traffic stop' is simply 'a seizure of the driver' of a vehicle for a 'brief investigative stop[]' supported by reasonable suspicion." *Id.*

1300 (9th Cir. 1976) (finding that where an officer sending a dispatch has reasonable suspicion to legitimize a stop, that officer may properly delegate the stopping function to any officer receiving the dispatch). The Court also likens this situation to that in *Sitz* in that it essentially constituted a blanket check of every vehicle passing through a certain area. The Court further finds that, like *Sitz*, the instant case passes the *Brown* three-prong test because it sufficiently demonstrates: (1) the gravity of the concerns served by the seizure was significant, because it involved maintaining public safety by apprehending a suspect in a homicide investigation, with multiple arrest warrants, who had already fled police pursuit earlier that evening; (2) the degree to which the seizure advances the public interest was also significant, for the reasons given in (1); and (3) the severity of the interference with individual liberty was minor, given that each stop would normally constitute only a brief check in order to determine whether Defendant was in the vehicle.

Accordingly, the Court finds the vehicle stop conducted by Officer Cruz to be lawful, and a valid stop under the Fourth Amendment. The vehicle stop being valid on the basis of reasonable suspicion, the Court disregards the "hot pursuit" argument and any other arguments regarding exigent circumstances, as no exigent circumstances are required for the stop to be valid.

**II. Whether the impounding of the vehicle was outside the scope of the traffic stop**

Defendant also argues that, even if Officer Cruz had reasonable suspicion to initiate a vehicle stop, the impounding of the vehicle was outside the scope of the stop and therefore constituted an unreasonable seizure. As with Defendant's argument regarding the stop itself, Defendant's argument here is based on the presumption that the stop was a traffic stop performed pursuant to an earlier traffic infraction. Mot., at 6. Defendant argues that the scope

and duration of a detention is determined by the seizure's "mission" and must be carefully tailored to its underlying justification. *Id.* (citing *Rodriguez v. US*, 575 U.S. 348, 354 (2015); *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Because Defendant presumes that the purpose of the stop is to address the traffic violation, Defendant argues that the scope and duration of the stop should be appropriate to that purpose.

Defendant also argues that, upon confirming Defendant's identity and apprehending him, the impoundment of the vehicle and the detainment of the driver and front-seat passenger were no longer necessary. Defendant argues that "the officers arguably could have searched Babauta incident to arrest, but they did not." Mot., at 7.

The People's only argument in regard to the impounding of the vehicle is that the owner provided consent and confiscation forms to Detective G.S. Garcia, which "was stated on page 119 of the discovery." Opp., at 3. In the Consent to Search form, the driver consented to allow GPD officers to "search the following items," including: (1) "any items belonging to" the victim; (2) "any blunt force objects"; (3) "any items relating to this case"; and (4) the Lexus itself. Williams Decl., Ex. F.

Upon review of the evidence and the testimony given at the suppression hearing, the Court finds that, because the owner provided consent for GPD officers to search the vehicle, it was not improper for GPD to have the vehicle towed to the Mangilao crime lab for search. "The police may lawfully conduct a search or seizure without a warrant only if an exception to the warrant requirement exists," and "[v]oluntary consent is such an exception." *People v. Quintanilla*, 2020 Guam 8 ¶ 27.

Det. Pangelinan's report indicates that, on February 1, 2023, at approximately 9:47 p.m., the driver received a call from an unknown number asking to speak to the front-seat passenger,

after which the front-seat passenger directed her to a house in Agat where Defendant entered the vehicle carrying a "black bag pack," and the car was then pulled over shortly after. Williams Decl., Ex. C, 23-02207, p.119. Det. Pangelinan states that, after Defendant was taken into custody, a Sgt. M.S. Naputi verbally advised the driver of her Miranda rights, which she acknowledged and understood. *Id.* Det. Pangelinan's report further states that "[p]rior to her transport, [the driver] expressed her willingness too cooperate with Detectives, where she consented for her vehicle to be search[sic], and also to have Detectives confiscate any items relative to their investigation. Det. G.S. Garcia was present upon her acknowledging and signed said Consent to Search & Confiscate forms. *Id.* The Consent to Search form seems to have been signed at approximately 10:00 p.m. on February 1, 2023. Williams Decl., Ex. F. At approximately 10:50 p.m., Det. Pangelinan's record indicates he advised the driver of her Miranda Rights via the GPD Custodial Interrogations Rights Form, which she signed and agreed to speak to Det. Pangelinan. *Id.*, Ex. C, 23-02207, p.119. The driver gave her written statement at approximately 11:30 p.m. on the same date. *Id.*, Ex. E.

In determining whether, as a factual matter, the requisite consent was given to search the vehicle, the Supreme Court defers to the credibility determinations made by the trial court and reverse only where the trial court has committed clear error. *People v. Quintanilla*, 2020 Guam 8 ¶ 22.

Given the timeline, it appears that the driver willingly gave her consent to search almost immediately after the stop, prior to being transported to the Precinct to give her interview, and the vehicle was taken to the crime lab for the purposes of enacting that search. While the events seemed to have happened quickly, there is no evidence of coercion on the part of the officers or any sign that the consent was obtained under duress, and Defendant has presented no testimony

at the suppression hearing for the Court to find otherwise. Because this stop was not for the purpose of a mere traffic violation, but for the far more serious purpose of investigating a possible murder suspect, the Court finds that the search, and the impoundment conducted for that purpose, were therefore valid and well within the scope and duration of the detention.

**III. Whether the consent obtained to search the vehicle was valid**

Defendant further argues that, "because the consent was obtained during an unlawful encounter, it was invalid." Mot., at 7. "[I]f the consent was given during an unlawful encounter, the consent is invalid and the exception does not apply "absent a demonstration by the government both of a sufficient break in the causal chain between the illegality and the seizure of evidence, thus ensuring that the search is not an exploitation of the prior illegality, and of voluntariness." *Id. (*citing *People v. Camacho*, 2023 Guam 9 ¶ 15). Defendant argues that the People are unable to meet their burden to show that there was a sufficient break in the causal chain between the allegedly illegal stop and the seizure of the evidence. *Id.*

While warrantless searches and seizures are per se unreasonable, voluntary consent is an exception to the warrant requirement. *Cundiff*, 2006 Guam 12 ¶ 26. As noted above, the Court does not determine this to be an unlawful encounter, and thus the Court finds there is no need for the People to meet the burden under those circumstances. Instead, "[w]here the consent occurs during a lawful encounter or detention, the validity of the exception turns on whether the consent was voluntarily given." *Camacho*, 2023 Guam 9 ¶ 15.

**IV. Whether the consent to search the vehicle was voluntary under the totality of the circumstances**

Defendant argues that, even if the encounter was lawful, "it is clear from the totality of circumstances that the consent was[sic] cannot be deemed 'voluntary' within the meaning of the

Fourth Amendment. Mot., at 8. Defendant asserts that the prosecution bears the burden of demonstrating the voluntary nature of the consent by a preponderance of the evidence." (citing *People v. Santos*, 1999 Guam 1 ¶ 33. The People again only respond that the owner provided consent and confiscation forms to Det. Garcia, as shown in the discovery.

In determining the voluntariness of consent, the Guam Supreme Court has held that voluntariness is determined based on all relevant circumstances in a particular case. *Camacho*, 2023 Guam ¶ 19. "When evaluating the totality of the circumstances, courts are required to 'balanc[e] relevant factors surrounding consent and the credibility of those witnesses presenting evidence.,'" *Id.* The Court is required to "carefully sift through the unique facts and circumstances" of this case, "balancing the government's interest in conducting lawful searches and the defendant's right to be free from coercive conduct." *Id.*

The Guam Supreme Court has referenced two tests in analyzing voluntariness. *Id.* ¶ 20. The first test, derived from the Ninth Circuit, involves five factors:

1) Whether the defendant was in custody;
2) Whether the arresting officers have their weapons drawn;
3) Whether Miranda warnings have been given;
4) Whether the defendant was told he has a right not to consent; and
5) Whether the defendant was told a search warrant could be obtained.

*Id.* (citing *People v. Santos*, 1999 Guam 1 ¶ 36). When analyzing voluntariness under this test, the Ninth Circuit has held that "[n]o one factor is determinative in the equation. It is not necessary to check off all five factors, but 'many of this court's decisions upholding consent as voluntary are supported by at least several of the factors.' Nevertheless, these factors are only guideposts, not a mechanized formula to resolve the voluntariness inquiry. *Id.* (quoting *U.S. v. Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2004).

To the first factor, the Court finds that the evidence does not demonstrate that the driver was in police custody at the time she gave consent, but was merely being detained; the evidence indicates that, while detained, she consented to the search and "acknowledged and willingly agreed to be transported" to "continue[] the interview at the Agat Precinct," where she "acknowledged and signed a "GPD Custodial Interrogations Rights form." Williams Decl., Ex. C, 23-02207, p.119. The Guam Supreme Court has held that a person that there are two discrete inquiries to determine whether a person is "in custody." *People v. Santos*, 2003 Guam 1 ¶ 51. The first inquiry is, "what were the circumstances surrounding the interrogation," and the second inquiry is, "given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* "After addressing the two inquiries, the court must then resolve 'the ultimate inquiry,' which is '[was] there a formal arrest or restraint on freedom of movement to the degree associated with a formal arrest." *Id.* The fact that the driver was never indicated to have been restrained; the fact that she was asked to continue the interview at the precinct; the fact that said interview was not particularly long or aggressive and was conducted by only one officer; and the fact that she was released after only a couple of hours all lead the Court to find that the driver was not held in custody. *But see id.*, at ¶ 52 (finding that defendant was considered to be "in custody" because he was in the precinct for more than nineteen hours and was interviewed by various officers at three separate times).

To the second factor, there was no evidence that the arresting officers had drawn their weapons at any point during the stop, as no accounts indicate that weapons were unholstered during the approach of the vehicle or the subsequent arrest, and all accounts seem to state that Defendant was taken into custody "without further incident."

To the third factor, the police reports indicate that Miranda warnings were given to the driver before obtaining her consent, and were given to her again before her interview at the Agat Precinct. *Id.*

To the fourth factor, there is no express indication that the driver was told she had a right not to consent, only that "[p]rior to her transport, she expressed her willingness to cooperate with Detectives, where she consented for her vehicle to be search[sic], and also to have Detectives confiscate any items relative to their investigation." *Id.*

To the fifth factor, there is similarly no express indication that the driver was told that a search warrant could be obtained.

The Court finds that, under this test, even though all five factors have not been fully met, the evidence is sufficient for the Court to find that the consent was voluntary under the totality of the circumstances.

The Guam Supreme Court has also referenced the Eighth Circuit's six-factor test as helpful:

1) Whether the consenting person was detained and the length of time of the questioning;
2) Whether the consenting person was threatened, physically intimidated, or punished by the police;
3) Whether the person relied upon promises or misrepresentations made by the police;
4) Whether the person was in custody or under arrest when the consent was given;
5) Whether the person was in a public or secluded place
6) Whether the person objected to the search or stood by silently while the search occurred.

*Camacho*, 2023 Guam 9 ¶ 20 (citing *Santos*, 1999 Guam 1 ¶ 36). The Supreme Court has held that the above factors are "neither exhaustive nor dispositive," but that the Eight and Ninth Circuit factors are "potential considerations" that "should not be applied mechanically, because '[t]he concept of reasonable suspicion, like probable cause, is not readily, or even usefully, reduced to a neat set of legal rules.'" *Id.* ¶ 21.

As noted above, there is clear evidence that, even if the driver was not placed in custody, she was at the very least detained for questioning for several hours, but not at the time she gave consent. There is no evidence in the record to suggest she was threatened, physically intimidated, or punished by the officers when she gave her consent. There is no evidence in the record that she relied upon promises or misrepresentations made by the police to give said consent. While she may have been transported to be interviewed, the Court does not find the evidence to indicate that she was "in custody" for the purpose of this test, or under arrest, when the consent was given. The record indicates that she gave her consent in a public place, and that she did not object to the search.

Accordingly, the Court again finds that the satisfaction of most, if not all, of the above factors indicates that the consent was voluntary under the totality of the circumstances.

### V. Whether the items found in the vehicle are inadmissible products under the exclusionary rule and the fruit of the poisonous tree doctrine

Finally, Defendant argues that the evidence seized from the vehicle "must be suppressed under the Exclusionary Rule as being fruits of the unlawful stop and search." Mot., at 9. Again, this argument is based on the presumption that the stop was unlawful. Defendant cites to *Cundiff*, arguing that "[b]efore evidence may be suppressed under [the fruit of the poisonous tree] doctrine, the court must initially resolve whether the challenged evidence was come at by the initial illegality or instead by means sufficiently distinguishable to be purged of the primary taint." 2006 Guam 12 ¶ 41.

Under the fruit of the poisonous tree doctrine, the U.S. Supreme Court held that "verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest ... is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted

intrusion." *Santos*, 2003 Guam 1 ¶ 64 (citing *Wong Sun v. U.S.*, 371 U.S. 471 (1963). The Guam Supreme Court subsequently agreed that, "[a]lthough evidence subsequently obtained as the 'fruit' of a prior illegality is suppressible," the trial court has to resolve whether the challenged evidence was a result of that illegality or was discovered by separate, legal means. *Id.* ¶ 65.

However, because the Court has found the stop to be lawful, there is no "primary taint" to the evidence, and therefore no reason to consider an argument under the fruit of the poisonous tree doctrine.

## SUPPLEMENTAL BRIEF

### VI. Whether passengers have standing to challenge the search of their bags in another's vehicle where the driver has consented to the search of the vehicle

Defendant argues in his Supplemental Brief that a passenger of a vehicle also has standing to challenge the constitutionality of the search of their personal items inside a vehicle, such as backpacks, even where the driver has consented to the search of the vehicle. Defendant asserts that this standing arises from the passenger's reasonable expectation of privacy in their personal belongings, even if these items are placed within a vehicle that is not theirs. Supp. Br., at 7 (citing *U.S. v. Barber*, 777 F.3d 1303, 1305 (11th Cir. 2015) (finding passenger had standing to challenge the search of his bag in the car, recognizing a reasonable expectation of privacy in the bag where defendant was present during search of car and bag was at his feet when officers stopped car)).

The Guam Supreme Court has found that the police may lawfully conduct a search or seizure of a vehicle without a warrant if voluntary consent is given by a person with the authority to consent to the search. *People v. Quintanilla*, 2020 Guam 8 ¶ 27. The person with authority to consent to a search of the vehicle is the person in immediate possession of and

control over the vehicle and who has general access to all areas of the vehicle. *Id.* ¶ 28. In that same holding, the Supreme Court extended its reasoning to passengers' bags, citing for support a case in which "a search of a defendant's bag was valid where a driver consented to a search of the vehicle, and defendant told officers that the bag was his but did not revoke the driver's consent to search the entire car, including his bag." *Id.* (citing *U.S. v. West*, 321 F.3d 649, 651-652 (7th Cir. 2003). "By his silence in the face of her consent he forfeited any right to claim that her consent was ineffective to authorize the search because the bag was his." *West*, 321 F.3d at 651. The Court has found nothing in the record indicating that Defendant asked to keep his backpack, or stated that he did not want his backpack searched. There being no protest on the record, and Defendant having provided no evidence to the contrary, the Court finds that Defendant did not establish that the driver's consent was ineffective to authorize the search of Defendant's bag.

Accordingly, the Court finds that the officers searching the vehicle had apparent authority to search Defendant's backpack.

### CONCLUSION

Based on the foregoing, the Court hereby **DENIES** Defendant's Motion to Suppress.

**IT IS SO ORDERED** JUL 0 1 2024 .

**HONORABLE ARTHUR R. BARCINAS**
**Judge, Superior Court of Guam**

**SERVICE VIA E-MAIL**
I acknowledge that an electronic copy of the original was e-mailed to:
AG; Vanessa Williams; Gavin; D. Lujan; M. Hemlani
Date: 7/1/24 Time: 9:35
Cenlevio (v)
Deputy Clerk, Superior Court of Guam